UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                        Case No. 1:14-cr-23

v.                                          HON. JANET T. NEFF

SHAWN NICHOLAS FERGUSON and
JESSICA JOSETTE HAYSLIP,

                Defendants.

_____/

## OPINION

A February 12, 2014 Indictment charges Defendants with (1) Conspiracy to Manufacture Marijuana, 18 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(*vii*); and (2) Manufacture of Marijuana, 18 U.S.C. §§ 841(a)(1), (b)(1)(B)(*vii*), 18 U.S.C. § 2.  The charges stem from the evidence obtained in an October 3, 2013 search and seizure from Defendants' residence.  Pending before the Court are Defendant Ferguson's Motion to Suppress (Dkt 31) and Defendant Hayslip's Motion to Suppress (Dkt 35).[1]  The government filed a combined response (Dkt 38), to which Defendant Ferguson filed a reply (Dkt 39).  On July 24, 2014, the Court heard testimony from one of the police officers who conducted the search; the audio tape of their search; and oral argument on the motion.  The Court requested the government file a transcript of the audio tape, which the government filed on August 6, 2014.  After careful consideration of the transcript, the testimony, and the parties' written and oral

_____

[1]The Court intends to address the government's pending Motion in Limine (Dkt 40) at the final pretrial conference, if necessary.

arguments, the Court determines that Defendants' motions to suppress are properly granted, for the reasons that follow.

## I.  FACTS

On December 11, 2012, and again on January 25, 2013, Central Michigan Enforcement Team (CMET) officers received information about an illegal marijuana grow operation in a garage—a pole barn—at 1251 E. Station Road, Sheridan, Evergreen Township, Montcalm County, Michigan (Medler Aff., Dkt 31-3 at 3; Incident Report, Dkt 31-2 at 2).  Ferguson and Hayslip, now husband and wife, resided at this address.  CMET applied for a search warrant of the power and electricity records for the property, which was granted (Incident Report, Dkt 31-2 at 3; Aff., Dkt 31-3 at 3-4; Warrant, Dkt 31-3 at 5).  The police did not obtain a search warrant for the residence or its curtilage.

On October 3, 2013, around 7:00 p.m., Montcalm County Deputy Sheriffs Jamie Medler and Trevor Bullock, both police detectives who were then assigned to CMET, went to 1251 E. Station Road, Sheridan, Michigan, ostensibly to conduct a "knock and talk" (Medler Report, Dkt 31-5 at 2).  As soon as Medler and Bullock got out of their unmarked car at the residence, they could smell fresh marijuana and observed surveillance cameras on the garage adjacent to the residence (*id.* at 3).

Defendants came out of the residence, and the detectives introduced themselves and advised that they were there to investigate a complaint of a illegal marijuana grow.  Detective Medler stated that he could smell marijuana and asked if it was medical marijuana (Medler Report, Dkt 31-5 at 3), i.e., marijuana grown for medicinal purposes under the provisions of the Michigan Medical Marihuana Act (MMMA), MICH. COMP. LAWS § 333.26421 *et seq*.  Ferguson stated that it was a

2

medical grow, and Detective Medler asked to see the required paperwork. Ferguson and Hayslip went into the house to look for the paperwork while the detectives stayed outside on the driveway. Ferguson produced his own medical marijuana patient card, and Hayslip produced no paperwork. Ferguson admitted that he was not a caregiver for anyone but claimed that Hayslip was a caregiver for 4 to 7 patients, although her paperwork was "messed up" four months ago (Medler Report, Dkt 31-5 at 3-4).

The detectives did not then obtain either a search warrant or produce the consent-to-search forms for Defendants to sign or even ask Defendants for consent to search the premises; rather, Detective Bullock asked Ferguson how many marijuana plants he had in the garage, to which Ferguson replied, "Like one hundred and seventy" (Dkt 43 at 3). Ferguson unlocked the garage where he had three grow rooms. Detective Bullock asked Ferguson, "How do I take a look in there?" and Ferguson replied, "Just open that" (*id.*). Detective Bullock then asked Ferguson how many marijuana plants he had in another room, to which Ferguson replied "[s]ixty" (*id.* at 4). Detective Bullock indicated that he counted forty-nine (*id.*). The detectives asked Ferguson if he had any more marijuana, to which he responded he had "one more hanging," another ounce in an RV parked on the property, and "leaves or something" in the house (*id.* at 4-5). Detective Medler determined, "Well, you guys have way too many" (*id.* at 5). Nonetheless, the detectives continued walking around the property with Ferguson and Hayslip, looking for evidence in the RV as well as rooms in the house, where Detective Bullock observed, "I think I counted like one hundred [plants] in here" (Dkt 43 at 11).

At 7:58 p.m., approximately one hour after their arrival, the police detectives asked Ferguson and Hayslip to sign a written consent to search form, noting that "[w]e're just asking you to consent

3

on paper for us [to] do this again just a little more thorough. . . . It's basically going to be the same thing that we did" (Dkt 43 at 19).  Both Ferguson and Hayslip signed the consent to search form (Ex. 2).  Three other officers then joined Bullock and Medler, and the marijuana that forms the basis of the charges against Defendants was seized.

## II.  LEGAL PRINCIPLES

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.'"  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Id.*  Consent, which may be express or implied, is a voluntary waiver of Fourth Amendment rights.  *Id.* at 235.  The validity of a person's consent "is a question of fact to be determined from the totality of the circumstances." *Id.* at 227.  "[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."  *Id.* at 249.

A "knock and talk" is a consensual encounter and does not contravene the Fourth Amendment.  A "knock and talk" is based on the principle that "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'"  *Florida v. Jardines*, ___ U.S. ___; 133 S. Ct. 1409, 1416 (2013) (quoting *Kentucky v.*

*King*, ___ U.S. ___; 131 S. Ct. 1849, 1862 (2011)). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 1415. "The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose." *Id.* at 1416.

Federal courts, including the Sixth Circuit Court of Appeals, have recognized the "knock and talk" technique as "a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *Ewolski v. City of Brunswick*, 287 F.3d 492, 504-05 (6th Cir. 2002) (quoting *United States v. Jones*, 239 F.3d 716, 720 (5th Cir.), cert. denied, 122 S. Ct. 142 (2001)). "[W]hen the police come on to private property to conduct an investigation ... and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003) (quoting 1 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment 2.3(f), at 506-08 (3d ed. 1996)). *See, e.g., United States v. Smith*, 783 F.2d 648, 652 (6th Cir. 1986) (officers "did not violate Helton's right to privacy by entering the driveway and proceeding to the area of the residence").

"In order to deter law enforcement officials from violating the Fourth Amendment by stopping persons without reasonable suspicion or by arresting them without probable cause, the Supreme Court has directed that 'all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source.'" *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (citing *Mapp v. Ohio*, 367 U.S. 643, 654 (1961); *Weeks v. United States*, 232 U.S. 383 (1914) (establishing the exclusionary rule)).

The exclusionary rule is supplemented by the "fruit of the poisonous tree" doctrine, "which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *Pearce*, 531 F.3d at 381 (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963) (emphasis added)). "[I]n order to exclude evidence under [the exclusionary rule and the 'fruit of the poisonous tree' doctrine], the defendant must show more than 'the mere fact that a constitutional violation was a 'but-for' cause of [the police's] obtaining [the] evidence.' *Hudson v. Michigan*, 547 U.S. 586, 592. '[B]ut-for causality is only a necessary, not sufficient condition for suppression.' *Id.* 'Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Pearce*, 531 F.3d at 381 (quoting *Wong Sun*, 371 U.S. at 487-88).

Defendants, as the proponents of the motions to suppress, generally bear the burden of establishing that their Fourth Amendment rights were violated. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). However, where, as here, "a prosecutor seeks to rely upon consent to justify the lawfulness of a search, [s]he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. N. Carolina*, 391 U.S. 543, 548 (1968).

### III.  ANALYSIS

The facts in this case are not in any real dispute, only the import of the facts, when judged by the controlling legal principles. Defendants argue that even assuming the search and seizure began with a consensual encounter, the police lacked a valid exception to the warrant requirement to justify the search and seizure at the time it took place because consent was not obtained until after the search and seizure had already occurred (Dkt 31 at 10-13; Dkt 36 at 5-6). Defendants also argue

that the after-the-fact consent the police detectives obtained does not constitutionally remedy the prior illegal search and seizure (Dkt 31 at 11-12; Dkt 36 at 6-8; Dkt 39 at 1-2), an argument to which they returned during the motion hearing.[2]

The government contends that Ferguson voluntarily consented to showing the police detectives the growing marijuana in the garage and the processed marijuana in the home and the RV (Dkt 38 at 10). The government further argued at the motion hearing that the hour the police detectives spent at Defendants' residence qualified as a permissible "knock and talk," claiming that the officers were "not searching anything" during that first hour (7/24/14 Motion Hrg. Tr. at 33).

The government's arguments lack merit.

As noted, a "knock and talk" is premised on the implicit license that permits a visitor to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 133 S. Ct. at 1415. Relevant here is the Supreme Court's additional observation that "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 1416. "It is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that... But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search." *Id.* at 1416 n.4. In *Jardines*, for example, the officer's entry into the curtilage violated the Fourth Amendment because his "behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do." *Id.* at 1417.

---

[2]As authority for this argument, Defendants rely on *United States v. Hurston*, 12 F. Supp. 2d 630 (E.D. Mich. 1998), a case that this Court finds factually distinguishable inasmuch as the antagonistic actions by the police in *Hurston* are not present here. That said, the absence of evidence of overt duress or coercion does not end the voluntariness inquiry. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Indeed, it was the reassurances and lulling by the police detectives in this case that, in part, produced the cooperation by Defendants.

Here, too, the police detectives' actions and inquiries objectively reveal a purpose to conduct a search to support or contradict the information they had received of an illegal marijuana grow. Although the government claims that the police detectives were "not searching" the buildings they entered during the hour they spent at Defendants' residence, just "knocking and talking," the Supreme Court instructs that if "'the Government obtains information by physically intruding' on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has 'undoubtedly occurred.'" *Jardines*, 133 S. Ct. at 1414 (quoting *United States v. Jones*, ___ U.S. ___; 132 S. Ct. 945, 950 n.3 (2012)).  The record in this case leaves the Court with no doubt that the detectives were "obtaining information" when they entered Defendants' garage, RV and residence, areas where privacy expectations are the most heightened.

Indeed, even the decision to seize evidence occurred very early in the evening:

THE COURT:  At what point did you and/or your partner make the decision that you were going to, I think as you put it in the tape, that you were going to have to take the plants?

DETECTIVE MEDLER:  To be honest, as soon as I saw how many plants there were, I knew we were going to have to do that because they were grossly over what they were legal to have if they had all the correct paperwork.

THE COURT: And at what point was that?  Was that when you first walked into the garage?

DETECTIVE MEDLER:  Yes, ma'am.

(7/24/14 Motion Hrg. Tr. at 28).

The remaining question is whether the warrantless search was conducted with Defendants' consent, either their implied consent, as the search progressed, or their express consent, by virtue of the detectives having subsequently obtained Defendants' signatures on the consent-to-search forms to conduct "a little more thorough" search.  Several factors in this case convince the Court that

8

the warrantless search in this case was not conducted pursuant to Defendants' consent, either implied or express.

First, a careful review of the October 3, 2013 transcript indicates that Defendants did not expressly invite the police detectives to "linger," in the words of the *Jardines* Court, and certainly not to trawl their property for drugs and weapons for nearly an hour.  The impetus to remain was driven by the police detectives.  For example, Detective Medler asked, "So there's nothing in the house?"  And Detective Bullock asked Ferguson, "Could my partner and I just talk to you outside for a second?"

Second, the Court determines that the detectives' inquiries, such as  "How do I take a look in there," implied that they were, in fact, entitled to look.  *Cf. United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (holding that the plain-clothes officers obtained consent coercively by asking for permission to search the bag, without detention, threat, or speech above conversational tone, because the suspect responded: "You've got the badge, I guess you can.").

Third, the Court finds determinative the context within which Defendants "cooperated" with the police.  The government emphasized during questioning of Detective Medler and during oral argument that Defendant Ferguson turned off the security system and unlocked doors for the police detectives, but Defendants' willingness to cooperate with the police is not viewed in a vacuum.  Rather, consent is determined from the totality of the circumstances.  *See Schneckloth*, 412 U.S. at 227; *see also Turk v. Comerford*, 488 F. App'x 933, 942-43 (6th Cir. 2012) ("without more, there is nothing about unlocking a door that demonstrates consent—unequivocal, specific and intelligently given, to an officer's entry into a home").

Consent is not voluntary "if the police in the course of an illegal search find certain incriminating evidence and then obtain the permission of the person in charge of the place searched to search the balance of that place." *See* 4 LaFave, *supra* § 8.2(d) (5th ed. 2014). "The purported consent given in such circumstances is nothing more than 'submission or resignation to police authority,' for the individual most likely 'erroneously believed that it was useless to resist,' even if advised of a right not to consent." *Id.* (footnotes omitted). *See also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("[T]he 'reasonable person' test presupposes an innocent person.").

Hence, the police detectives' inquiries to Defendants here, such as "What's in this medicine container," must be viewed in light of the fact that the detectives had determined and confronted Defendants with the fact that Defendants had "way too many" plants to come within the provisions of the MMMA. Defendants' cooperation, therefore, was given not only in response to the general authority wielded by two police officers present on their property but also in the face of evidence implicating them in a crime, even as the detectives told Defendants, "[y]ou don't have to talk to us if you don't want to." In other words, at the time of Defendants' cooperative efforts, and particularly by the time they signed the consent-to-search forms, "the jig was up." *See United States v. Collins*, 510 F.3d 697, 701 (7th Cir. 2007) (where without a search warrant or exigent circumstance "the police barged in and were searching the house," that meant the "jig was up" and thus the defendant's subsequent consent was involuntary).

In sum, the Court holds that the evidence seized did not result from a course of law enforcement action justifiable under the Fourth Amendment and is properly excluded as having been gained by exploitation of that illegality.

## IV.  CONCLUSION

Defendants' Motions to Suppress (Dkts 31 & 35) are granted.  An Order consistent with this Opinion will be entered.


DATED: August 20, 2014                                    /s/ Janet T. Neff
                                                          JANET T. NEFF
                                                          United States District Judge